In deciding the question which this case presents, it is proper to be governed by the amount of pay and emoluments allowed to some officer of the designation of major, known to the existing laws of the country. To this rule it seems to me there can be no valid objection. If applied then, it conducts us to majors of engineers, artillery, infantry, and riflemen, to all of whom is allowed the same compensation, to wit, $50 a month, and four rations a day respectively. To fortify this conclusion, it may be remarked that judge advocates, and chaplains, are allowed the same compensation to which majors are entitled. And it will hardly be contended that they can set up any just claim to the pay of a major of cavalry. In making provision for the corps of engineers and military academy, the allowance to the professor of natural and experimental philosophy was established at that of a lieutenant colonel; not a lieutenant colonel of cavalry. So to the professor of mathematics, and to the professor of the art of engineering, the pay and emoluments of a major, but not of a major of cavalry. Although no definite and precise rule is given by which to determine what compensation was to be paid to these professors respectively, yet as the adjunct cavalry is not used, no doubt is left they are to receive the pay and emoluments of a lieutenant colonel and major of infantry; and such is the fact as appears by a tabular statement of what is paid to every person in any wise connected with the service, appended to rules and regulations of the army, revised in 1817.

The deposition of General Scott has received a full share of my attention. He states that since the passage of the act of March 3, 1813 [2 Stat. 819], paymasters have received the compensation of a major of cavalry. In his compilation, to which he refers, in settling official rank, he is governed by the amount of pay and emolument. This rule induces him to place judge advocates, chaplains, and paymasters in the same grade, which as he believes entitles each of these officers to the allowance of a major of cavalry. In this matter there must be some mistake. The general, or other officers of elevated standing, must, as I apprehend, labor under some misapprehension. The table to which I have already alluded, shows beyond doubt, that the compensation granted to judge advocates, chaplains, and paymasters, is that of a major of infantry; and so say the accounting officers of the treasury department.

From the consideration which I have bestowed upon this case, I feel little hesitation in giving it as my opinion, that the defendant is intitled to the pay and emoluments of a major of infantry, and nothing more.

## Case No. 15,273.

UNITED STATES v. HADE.

[See Case No. 15,274.]

## Case No. 15,274.

UNITED STATES v. HADE.

District Court, N. D. Ohio. 1877.

NATIONAL BANKS — EMBEZZLEMENT BY CASHIER — INDICTMENT BY GRAND JURY.

On motion to quash an information for abstracting and misapplying funds of a national bank, *held*, that the charge of misapplying the funds of a national bank by its cashier is a charge of an "infamous crime," which, under the constitution of the United States, must be instituted by indictment of a grand jury, and cannot be prosecuted by a mere information filed by the district attorney with the assent of the court. The information was quashed.

[Decided by WELKER, District Judge. Nowhere reported; the opinion filed in clerk's office. The statement of the points determined was taken from 10 Chi. Leg. News, 22.]

## Case No. 15,275.

UNITED STATES v. HAINES et al.

[5 Mason. 272.] [1]

Circuit Court, D. Massachusetts. May Term, 1829.

SEAMEN—OBEDIENCE—NEW MASTER—REVOLT.

1. The crew of a ship who have signed shipping articles for the voyage under a particular master, without any clause providing for a change of master, are not discharged from the articles by the dismissal of the master by reason of sickness, or any other reasonable cause, and the appointment of a new master; but they are bound to obey the new master.

[Cited in U. S. v. Nye, Case No. 15,906.]

2. If in such case they combine together to refuse all duty on board, and to refuse obedience to the new master, that is an endeavour to make a revolt, within the meaning of the crimes act of 1790, c. 9 (36), § 12 [1 Stat. 115; 1 Story's Laws, 85.]

[Cited in U. S. v. Gardner, Case No. 15,188; U. S. v. Forbes, Id. 15,129; U. S. v. Huff, 13 Fed. 636.]

Indictment against the defendants [Benjamin Haines and others] for an endeavour to make a revolt on board the ship Plato, in Boston harbour, founded on the crimes act of 1790, c. 36 (9), § 12 [1 Story's Laws, 85; 1 Stat. 115]. Plea, not guilty. At the trial it appeared in evidence, that the ship was owned by American citizens, and was bound on a voyage from Boston to Havana, from thence to ports in Europe, from thence to the East Indies, and back to Europe or the United States; and that one Thomas Dimmock was master. The defendants were seamen on board, and had shipped for the voyage under the common shipping articles, in which Thomas Dimmock was described as master, and there was no clause, "or whoever else shall be master for the voyage," in the articles. The ship being ready for the voyage dropped down to the outer harbour of Boston, called "Nantasket Roads," to proceed to sea, about the 10th of June, 1829.

[1] [Reported by William P. Mason, Esq.]